**PITTSTON COMPANY, Plaintiff,**

v.

**ALLIANZ INSURANCE CO., et al., Defendants.**

**Civ. No. 90–3631.**

United States District Court, D. New Jersey.

Aug. 4, 1992.

Robert B. Bell, Wiley, Rein & Fielding, Washington, D.C., for defendant, Travelers.

John T. Harding, Zelle & Larson, Waltham, Mass., for defendants, Wausau and American Marine Underwriters.

David J. Farber, Patton, Boggs & Blow, Washington, D.C., for plaintiff, Pittston.

## OPINION & ORDER

PISANO, United States Magistrate Judge:

This matter comes before the court on a motion by the defendant, Travelers Insurance Co., joined by several other defendants,[1] seeking to compel discovery pursuant to *Fed.R.Civ.P.* 26 of two classes of documents—those generated in the course of the underlying litigation for which in-

---

1. Joined in the motion are Employers Insurance of Wausau, American Marine Underwriters, Inc., Hartford Ins. Co., Hartford Fire Ins. Co., Allianz Ins. Co., Ancon Ins. Co., Rochdale Ins. Co., Chiyoda Fire and Marine Ins. Co., Unigard Mutual Ins. Co., Unione Italiana Reinsurance Co., Gibbs and Co., and London Market Insurers.

demnity is sought; and, documents related to the stock purchase agreement between the plaintiff, Pittston, and Ultramar America Ltd. The plaintiff has asserted that the requested documents are protected by the attorney-client privilege and are attorney work product.

## I. BACKGROUND

This action arises out of an insurance coverage dispute regarding remediation costs for environmental damage to the land and water at a petroleum terminal and storage facility located in Jersey City, New Jersey, commonly known as Tankport. Pittston purchased the Tankport facility in 1954. In 1983, Ultramar America Ltd. acquired Tankport pursuant to a stock purchase agreement. The agreement contained an indemnity provision under which Pittston agreed to indemnify Ultramar for liability resulting from petroleum spills at the site prior to the purchase.

In 1988, Ultramar filed a complaint in this district relating to chromium and petroleum contamination at the Tankport site. Pursuant to a settlement agreement, Pittston agreed to indemnify Ultramar for 80% of cleanup costs for remediation of petroleum contamination at Tankport.

Pittston and Ultramar submitted the proposed settlement agreement to their insurers for comment. The insurers, now defendants, claim that there was not sufficient time to adequately respond, and did not respond or responded that the plaintiff should act as a "reasonable uninsured."

After settlement of the underlying litigation, Pittston initiated this action seeking indemnification under comprehensive general liability (CGL) policies and comprehensive marine liability policies (CMLP). The insurers claim that the plaintiff failed to comply with certain conditions precedent and therefore is not covered under the policies.

Pittston has refused to provide documents which relate to the underlying Ultramar—Pittston litigation and to issues of insurance coverage for the Tankport site. Plaintiff asserts that the documents are protected by the attorney-client privilege and the work product doctrine.

## II. ANALYSIS

The matters presented in the instant motion involve an increasingly common dispute between an insured and insurer regarding the ability of the insurer to discover otherwise privileged materials generated in an underlying litigation for which the insured is seeking indemnification. To begin, the defendants concede that plaintiffs are not obligated to produce privileged documents directed specifically to coverage questions at issue. *See Independent Petrochemical Corporation v. Aetna Casualty and Surety*, 654 F.Supp. 1334, 1365 (D.DC 1986) On the face of the plaintiff's privileged documents log, there are 40 such documents.[2] However, the defendants have offered three reasons to compel the production of the remainder, including: the "common interest" doctrine, the "at issue" doctrine, and the cooperation clause of the insurance contract.

### Common Interest Doctrine

The common interest doctrine has its origins in the joint attorney doctrine, 8 Wigmore, Evidence § 2312,

> The chief instance occurs when the same attorney acts for two parties having a common interest, and each party communicates with him. Here the communications are clearly privileged from disclosure at the instance of a third person. Yet they are not privileged in a controversy between the two original parties, inasmuch as the common interest and employment forbade concealment by either from the other. *See also Eureka Investment Corp. v. Chicago Title Ins. Co.*, 743 F.2d 932 (1984).

The application of the attorney-client privilege in the joint attorney context has been adopted in the New Jersey Rules of

---

**2.** These documents are numbered: 29, 31, 32, 34, 35, 36, 59, 60, 61, 62, 65, 67, 70, 72, 78, 81, 119, 189, 224, 225, 230, 233, 336, 239, 240, 242, 253, 254, 262, 264, 265, 267, 268, 269, 272, 273, 274, (as the documents are listed in Exhibit 1 of defendant's memorandum).

Evidence[3], Rule 26, N.J.S.A. 2A:84A–20(2)(c).[4]

■ The common interest doctrine is an application of the joint attorney doctrine. Under the common interest doctrine, although an attorney actually represents only one party, there is no waiver of the attorney-client privilege by disclosure of privileged communications to third parties with a "community of interest". A community of interest exists where different persons or entities "have an identical legal interest with respect to the subject matter of a communication between an attorney and client concerning legal advice ... The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial." *Duplan Corp. v. Deering Milliken Inc.*, 397 F.Supp. 1146, 1172 (S.D.S.C.1974), *see also In Re State Commission of Investigation Subpoena Number 5441*, 226 N.J.Super. 461, 466, 544 A.2d 893 (App.Div.1988), *Weil Ceramics & Glass v. Work*, 110 F.R.D. 500, 502 (E.D.N.Y.1986).

■ A quandary arises when the rule is used offensively, as here, to compel production of otherwise privileged materials. It seems clear that use of the doctrine is warranted when there is a dispute between insurer and insured regarding underlying litigation in which the insured was represented by an attorney appointed by the insurer. *See Truck Ins. Exchange v. St. Paul Fire and Marine Ins. Co.*, 66 F.R.D. 129 (1975); *Longo v. American Policyholder's Ins. Co.*, 181 N.J.Super. 87, 436 A.2d 577, (L.Div.1981); N.J.S.A. 2A:84A–20(2)(c). However, there is considerable difficulty in applying the doctrine where there was actually no common attorney in the underlying litigation and the existence of a "common interest" is itself at issue.

The primary issue is whether the documents were generated with the reasonable expectation that the documents would be concealed from plaintiff's insurer. *See IPC v. Aetna Casualty and Surety*, 654 F.Supp. 1334, 1365. *IPC* also involved an environmental pollution coverage dispute. In making its determination that the insurer was entitled to privileged documents, the court noted that "Communications between an insured and its attorney connected with the defense of underlying litigation are normally not privileged vis-a-vis the insured's carrier in subsequent litigation." *Id., see also Carey Canada Inc. v. Aetna Casualty and Surety Co.*, 118 F.R.D. 250, 251 (D.D.C.1987). Also, the common interest doctrine "trumps an insured's claim of privilege where there is admittedly a common interest between the insurers and the insureds in minimizing exposure in the underlying ... claims, but there is sharp dispute between insurers and insureds regarding insurance coverage. *Id.*

However, the court in *IPC v. Aetna* expressly grounded its determination on the fact that "the defendants are obligated, at this time to defend plaintiffs in the underlying dioxin-related cases. To do this, access to documents prepared in anticipation of those claims are essential." *IPC v. Aetna*, 654 F.Supp. at 1365.

The Court in *Carey Canada Inc. v. Aetna Casualty and Surety Co.*, 118 F.R.D. 250, 251, determined that there was no common interest where,

"the documents were prepared in an atmosphere of uncertainty as to the scope of any identity of interest shared by the plaintiff and Aetna [the insurer]. In this context plaintiffs could reasonably have expected that documents concerning settlement in the underlying cases would be privileged and hence undiscoverable." *Carey Canada*, at 251.

The court emphasized that the communications sought were made after the interests of the parties had diverged. *Id.* at 252.

---

**3.** The court presumes that New Jersey law is applicable to questions of privilege pursuant to Judge Wolin's opinion of May 26, 1992 and *Fed.R.Evid.* 501.

**4.** 2A:84A–20 Lawyer-client privilege

(2) Exceptions. Such privilege shall not extend ... (c) ... Where 2 or more persons have employed a lawyer to act for them in common, none of them can assert such privilege as against the others as to communications with respect to that matter.

In *Remington Arms Co. v. Liberty Mutual Insurance Co.*, 142 F.R.D. 408 (D.Del. 1992), the court rejected the application of the doctrine proposed here, determining that "the rationale which suppor:s the common interest exception to the at orney-client privilege simply doesn't apply if the attorney never represented the party seeking the allegedly privileged materials." *Id.* at p. 418, *citing Bituminous Casualty Corp v. Tonka Corp*, 140 F.R.D. 381, 386 (D.Minn.1992).

In *Waste Management v. International Surplus Lines*, 144 Ill.2d 178, 161 Ill.Dec. 774, 579 N.E.2d 322 (1991), the Supreme Court of Illinois advocated a broader interpretation of the doctrine. The Court determined that since the insured and insurer are in privity of contract, and due to the nature of the relationship between the two, an attorney retained by an insured, although not retained or in direct communication with the insurer, acts for the mutual benefit of both the insured and the insurer. *Id.* 161 Ill.Dec. at 781, 579 N.E.2d at 329. Therefore, the common interest doctrine compelled disclosure because there was no reasonable expectation of privacy.

There is little case law in New Jersey construing the use of the common interest doctrine as sought here. In *In re Environmental Insurance, Declaratory Judgment Action (SCM v. Lumbermans Mutual, et al.)*, 5 Mealey's Lit.Rep.: Insurance, Issue 48 October 22, 1991 at D–1 (Superior Court, Union County, 1991), the court adopted the view of the Illinois Supreme Court in *Waste Management*. In *Historic Smithfield Development Company v. Chelsea Title and Guarantee Co.*, 190 N.J.Super. 567, 464 A.2d 1177 (App.Div. 1983), the court, interpreting *Evid.R.* 26, determined that "more is required to establish a lawyer-client relationship than, as appears here, merely that the insurer ultimately absorbs the cost of the insured's legal representation." *Id.* at 572, 464 A.2d 1177. However, the court in *Historic Smithfield* had determined that although

there was some agreement regarding cooperation between the insured and insurer, there was clearly an irreconcilable conflict between them.

To permit insurers unrestrained access to attorney-client communications and work product where those insurers refused to take part in litigation despite notice and an opportunity to participate would distort the "common interest" doctrine. The use of the doctrine sought by the defendants is a far cry from its original application in the joint representation context. Notwithstanding the opinion in *Waste Management* and *SCM v. Lumbermans Mutual*[5], this court is constrained to interpret the doctrine narrowly.

The interests of the parties to this action when Pittston and Ultramar entered into their litigation were not "identical". *See Duplan*, 397 F.Supp. 1146, 1172, *see also In Re Subpoena Number 5441*, 226 N.J.Super. 461, 466, 544 A.2d 893. Even assuming a common interest in limiting the amount of damage, the parties do not have a common interest in characterizing how that damage occurred, what type of damage occurred, or how the plaintiff responded. *Remington Arms Co. v. Liberty Mutual Insurance Co.*, at 418.

There is no actual "common interest" since the situation inevitably presented is one in which the insurer claims that there is no coverage for the underlying claim. Therefore, theoretically, it is of no import or consequence to the insurer whether or how much the "uninsured" has incurred in liability unless and until the insurer has been forced, through a subsequent judgment, to accept that there is an actual common interest.

Further, the fiction that there is no reasonable expectation of privacy due to an identity of interest is contrary to the perception under which the insured would operate in the underlying litigation. Particularly in the environmental liability context,

---

**5.** Although the defendants contend that in presumptively applying New Jersey law the *SCM v. Lumbermans Mutual* opinion should act as precedence, no New Jersey court could accept the unpublished opinion as precedence under *New Jersey Court Rule* 1:36–3. Although instructive, this opinion is not binding.

the insured often enters and acts in the underlying litigation alone, with an apprehension of not only the outcome of that litigation, but also of the foreboding litigation with its insurers. The communications between attorney and client would not reflect a community of interest with its insurers. This is so notwithstanding any duty to defend and cooperation clauses in the insurance policies.

Defendant Travelers is in a somewhat different position from that of the marine insurer defendants in that Travelers was not notified of the petroleum claim or the settlement until three days prior to the settlement. However, it would be illogical to impute that there was no reasonable expectation of privacy vis-a-vis Travelers alone since the plaintiff was aware of the position of its other insurers as evidenced by the outright denial, cryptic denial ("act as a reasonable uninsured"), or evasion found in the responses to the insured's request for the insurers' positions on coverage. The plaintiff acted in the underlying litigation cognizant of the position of the majority of its insurers.

The common interest doctrine is best applied in the context of an actual triadic relationship between insured, attorney and insurer. Based upon the circumstances under which the plaintiff acted in the underlying litigation, Pittston communicated with its attorneys in an atmosphere of uncertainty as to any identity of interest with its insurers and with a reasonable expectation of privacy. Therefore, the documents generated from such communications are privileged and may be withheld from discovery.

### Documents "In Issue"

The defendants also contend that the attorney-client and work product documents in the privileged document log should be produced because these documents are "in issue" in this litigation; therefore, any assertion of privilege is impliedly waived.

The "in issue" doctrine is operative when the party has asserted a claim or defense that he intends to prove by use of the privileged materials. *Remington Arms*, 142 F.R.D. 415; *North River Insurance v. Philadelphia Reinsurance Corp.*, 797 F.Supp. 363, 370 (D.N.J.1992). Under New Jersey law the attorney-client privilege may be waived by overriding public policy concerns. *See United Jersey Bank v. Wolosoff*, 196 N.J.Super. 553, 563, 483 A.2d 821 (App.Div.1984). There is a tripartite test to determine whether the privilege should yield. *Id., citing to In Re Kozlov*, 79 N.J. 232, 398 A.2d 882 (1979),

First, "there must be a legitimate need ... to reach the evidence sought to be shielded. *Id.* at 243 [398 A.2d 882]. Second, "there must be a showing of relevance and materiality of that evidence to the issue before the court." *Id.* at 243–244 [398 A.2d 882]. Lastly, the party seeking to bar the assertion of privilege must show "by a fair preponderance of the evidence including all reasonable inferences that the information cannot be secured from a less intrusive source." *Id.* at 244 [398 A.2d 882].

Although the *Wolosoff* court did not explicitly include as a factor that the party seeking protection must have injected the communications into the action, the court did consider that as an important issue. In support of its conclusion, the court cited to several cases in which this injection was the prevalent factor. *See Wolosoff*, 196 N.J.Super. at 565–566, 483 A.2d 821.

The defendants have offered several reasons why they feel that the documents sought are "in issue" or germane to a material issue before the court. This includes information regarding the insured's knowledge regarding contamination at the site and the reasonableness of the settlement between the parties.

However, the plaintiff has not sought to use or inject any privileged documents as a part of a claim or defense. Therefore the "in issue" doctrine is inapplicable.[6]

---

**6.** This is true notwithstanding the production of the memo of plaintiff's counsel outlining the settlement and commenting that it is an "excellent result". (Traveler's Reply Brief, Exhibit I).

Some of the documents sought may contain relevant and material information. However, "It is always possible that the client's motive or conduct was influenced by something his attorney told him, but compelling the production cannot be justified solely as a means to check the insured's statements." *Remington Arms*, 142 F.R.D. 416. Rather than rummaging through attorney-client communications and attorney work product, it seems that information can be obtained through less intrusive means such as depositions or interrogatories and by use of settlement and site specific documents already produced by the defendants.

### Work Product

Pursuant to *Fed.R.Civ.P.* 26(b)(3), materials prepared in anticipation of litigation or for trial by another party by or for that party's representative may be produced "only upon a showing that the party seeking discovery has a substantial need of the materials in the preparation of the party's case and that the party is unable to without undue hardship to obtain the substantial equivalent of the material by other means." As set forth above, the information which the defendants seek may be obtained by other less intrusive means. Also, the defendants have not shown a substantial need for these particular documents.

### Cooperation Clause

 The defendants also contend that the cooperation clause in the insurance certificates creates a contractual obligation to produce the documents. One such cooperation clause provides:

> The insured shall cooperate with the company, and, upon the company's request, assist in making settlements, in the conduct of the suits and enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of bodily injury or property damage with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses ... (Defendants' moving brief, Exhibit 9).

It has been held that such clauses can apply "without limitation or qualification" and can be invoked in spite of the fact that the parties have taken adversarial postures, *See Waste Management*, 161 Ill.Dec. at 779–80, 579 N.E.2d at 327–28. The better view seems to be that a cooperation clause cannot be invoked for purposes other than those intended. *See, Bituminous Casualty*, 140 F.R.D. at 386, *North River*, 797 F.Supp. at 368. A fair reading of the clause would require cooperation in the underlying action for the purpose of defending claims by third parties. The cooperation clause does not "imply a duty to produce documents protected by attorney-client privilege in a coverage dispute." *Remington Arms*, at 417, *North River Insurance v. Philadelphia Reinsurance Corp.*, 797 F.Supp. at 368. Further, it would seem that such a broadly worded clause could not be interpreted to impose an intention by the insured to explicitly waive the attorney-client privilege or work product protection.

### Other Documents

The defendant marine insurers point out that no protection can be afforded several documents in the plaintiff's privilege log (Brief at 9, N.10). The three documents, correspondence between representatives of Pittston and Ultramar, are not protected by any privilege and therefore should be produced.[7]

### III. CONCLUSION

For the reasons set forth above, the motion of the defendants for production of the documents contained in plaintiff's privileged document log shall be denied except as provided herein.

SO ORDERED.

---

7. Those documents are 1) Memo of March 8, 1990, 2) Letter of March 12, 1990, and 3) facsimile of March 27, 1990.